## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SPORTSBUBBLE, INC.,

       Plaintiff,

          v.

THE WALT DISNEY COMPANY;
ESPN, INC.; and ESPN ENTERPRISES,
INC.,

       Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

PARTIES ......................................................................................................................5

JURISDICTION AND VENUE ....................................................................................5

FACTUAL ALLEGATIONS .........................................................................................6

I.      Sports Media Fragmentation.............................................................................6

II.     SportsBubble's Solution to Sports Media Fragmentation ...................................12

III.    SportsBubble and ESPN Begin Negotiating a Partnership and Sign an NDA .................16

IV.     SportsBubble Provides ESPN Confidential Information About Its Product
        Pursuant to the NDA ........................................................................................21

V.      ESPN Repeatedly Delays Consummating the Partnership Without
        Meaningful Explanation....................................................................................27

VI.     ESPN Launches a Copycat Product...................................................................31

VII.    ESPN's Conduct Has Harmed SportsBubble .....................................................39

COUNT ONE................................................................................................................41

COUNT TWO...............................................................................................................43

COUNT THREE............................................................................................................44

COUNT FOUR..............................................................................................................45

COUNT FIVE................................................................................................................46

COUNT SIX..................................................................................................................47

COUNT SEVEN............................................................................................................51

COUNT EIGHT.............................................................................................................55

COUNT NINE...............................................................................................................57

PRAYER FOR RELIEF.................................................................................................57

JURY TRIAL DEMANDED..........................................................................................58

**INTRODUCTION**

1.      This case concerns Disney and ESPN's unlawful campaign to mislead tech startup SportsBubble into turning over confidential trade secrets about its first-of-its-kind WatchSports software product so that ESPN could use that information to develop and launch its own copycat product.  In 2021, ESPN feigned interest in a partnership with SportsBubble (and signed a non-disclosure agreement) to induce SportsBubble to share its confidential trade and business secrets with ESPN.  ESPN claimed that it needed this information to evaluate WatchSports and the potential partnership.  In reality, ESPN never intended to consummate a partnership with SportsBubble (as it later admitted).  Instead, ESPN misappropriated SportsBubble's confidential information to develop a copycat product after stringing SportsBubble along for months in fruitless "negotiations," sidelining it from other lucrative partnerships.  SportsBubble brings this lawsuit to recover for the harm already caused by Disney and ESPN's unlawful conduct, and to enjoin ESPN from further profiting from its misuse of SportsBubble's confidential information.

2.      SportsBubble developed and offers a mobile and online application called WatchSports, which solves the problems of sports media fragmentation for consumers and businesses.  In today's streaming era, where a multitude of different services offer viewing for live sporting events, sports fans often struggle to find sports programs they want to watch and the online services offering such viewing.  WatchSports, a "Live Sports Event Programming Guide," solves that problem by aggregating and curating the myriad options for watching live sports and directly connecting users to the service(s) that offer the sports they want to watch.  WatchSports is free to consumers:  SportsBubble simply earns a referral fee from its affiliate marketing partners when a consumer subscribes to their services.

1

3.     Sports media pioneer Lydia Murphy-Stephans founded SportsBubble in 2018 and worked with a team of sports media veterans and engineers for four years to bring its WatchSports tool to life.  In August 2021, SportsBubble launched the WatchSports app and became the first company to market a "live sports event programming guide for the streaming era."

4.     In September 2021, SportsBubble began negotiating a partnership with ESPN that would allow sports fans to discover and connect directly to ESPN's sporting events through the WatchSports app.  By February 2022, ESPN and SportsBubble had agreed in principle on an affiliate marketing partnership to list ESPN+'s sporting events (approximately 40,000 per year) in the WatchSports app, permitting WatchSports users to connect directly to ESPN's platform to watch their selected ESPN+ event.  ESPN expressed its "excitement to be a part of SportsBubble," and agreed to provide its ESPN+ application programming interface ("API") no later than December of that year.

5.     During these negotiations, ESPN requested that SportsBubble share confidential technical information about how the WatchSports app actually functioned.  This request was unusual, and one that none of SportsBubble's many other partners ever made.  Nevertheless, SportsBubble agreed to share this information pursuant to a signed NDA to protect its confidential and proprietary trade secrets.  Over the next several months, in reliance on ESPN's expressed enthusiasm for SportsBubble's product, the proposed partnership agreement, and the NDA's protections, SportsBubble shared a trove of confidential information about WatchSports with Disney and ESPN executives.

6.     But ESPN's expressed enthusiasm—and its intention to enter a partnership with SportsBubble—was feigned.  In March 2023, ESPN announced publicly that it would be

launching a product—later named "Where to Watch"—that copied WatchSports' features, functions, and technology. Like WatchSports, ESPN's Where to Watch aggregates sporting events information on a single platform and connects users directly to the viewing services that offer them. Although public reports at the time revealed that ESPN had already been in discussions with potential business partners about Where to Watch for some time, ESPN and Disney never disclosed this fact to SportsBubble during negotiations over the preceding eighteen months.

7.      After announcing its copycat product, ESPN abruptly changed its tone with SportsBubble: ESPN suddenly advised that it had "no interest in a 'strategic partnership' with SportsBubble" and stated that it had not been interested in a partnership "since the inception of our conversations" in 2021.

8.      ESPN not only stole SportsBubble's business model and product, but it also stymied SportsBubble's growth by stringing SportsBubble along for months with false promises of a partnership, resource-intensive talks, and manufactured delays in the consummation of that partnership. While SportsBubble focused on its prospective partnership with ESPN, it put partnership discussions with the other major sports networks and event stakeholders on hold, losing valuable time it could have spent capturing more of the market through other opportunities. Indeed, as the first company to release a comprehensive solution to sports media fragmentation, and founded by a highly credible team, SportsBubble was uniquely positioned—and fully prepared—to move aggressively into the market, secure major lucrative partnerships, and attract millions of users.

9.      ESPN and SportsBubble had agreed on the principal terms of their partnership in February 2022, leaving only the final step of ESPN delivering its ESPN+ sporting event

schedule information to SportsBubble through the API.  The API was all SportsBubble needed

to enable ESPN+ integration and affiliate marketing operations with WatchSports.  But ESPN

began stalling the completion of this final step to avoid finalizing the partnership, making

false and contradictory claims about technical issues that ESPN claimed were delaying the

delivery of its ESPN+ API.  Even after SportsBubble offered to help ESPN solve any purported

technical difficulties, ESPN continued to deflect and delay while promising the partnership was

on track.  ESPN utilized those manufactured excuses to delay the finalization of the parties'

partnership for more than a year, letting ESPN run out the clock on SportsBubble while ESPN

incorporated SportsBubble's trade secret information to build and announce its copycat product

in March 2023.

      10.    The public announcement that ESPN, the largest sports media company in the

world, was launching a product identical to WatchSports had immediate and predictable

effects:  SportsBubble's lead investor prospect, who had previously valued the company at

$25 million, abruptly dropped out, citing ESPN's apparent product theft; and SportsBubble

lost traction with other sports stakeholders who were reluctant to partner with a new company

that would now be directly competing with ESPN in the sports marketplace.  Lacking the

funds to pursue further development and additional partnerships as planned, and having been

fraudulently induced for over a year to devote its limited resources to talks with ESPN,

SportsBubble was effectively sidelined.  But for ESPN's misconduct, SportsBubble would

have run fast and far into the market—with a clear runway and committed backers.

Meanwhile, ESPN's copycat product enjoyed immediate success upon launching in August

2024, surging to five million unique users in its first two months.

11.     SportsBubble therefore brings this action to recover for the significant harm that ESPN caused SportsBubble through its deceptive statements, theft of SportsBubble's trade secrets, and breach of the parties' NDA, and to enjoin ESPN from offering its copycat product built on technology misappropriated from SportsBubble.

## PARTIES

12.     Plaintiff SportsBubble, Inc. ("SportsBubble") is a Delaware corporation with its principal place of business in Oakland, California.

13.     Defendant The Walt Disney Company ("Disney") is a public company incorporated in Delaware with its principal place of business in Burbank, California.  Disney is the majority owner of Defendants ESPN, Inc. and ESPN Enterprises, Inc.

14.     Defendant ESPN, Inc. (collectively with Disney and ESPN Enterprises, Inc., "ESPN" or "Defendants") is a Disney affiliate incorporated in Delaware with its principal place of business in Bristol, Connecticut.

15.     Defendant ESPN Enterprises, Inc. is a Disney affiliate incorporated in Delaware with its principal place of business in Bristol, Connecticut.

## JURISDICTION AND VENUE

16.     This action arises, in part, under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq*.  The Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1337(a), as well as 15 U.S.C. §§ 15 and 26.

17.     The Court may exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).  Those claims arise from a common nucleus of operative fact as the federal claims, and exercising jurisdiction over both will avoid unnecessary duplication and advance interests of judicial economy, convenience, and fairness.

18.     The Court may exercise personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A), because defendants are subject to the jurisdiction of courts of general jurisdiction in the State of New York pursuant to (i) New York Civil Practice Law and Rules ("CPLR") § 301, because Defendants are licensed to do business and are doing business in New York, and (ii) CPLR § 302(a)(1) and (a)(2), because the claims alleged herein arose from Defendants' transaction of business within the State and/or from tortious acts committed by Defendants within the State.  Among other things, ESPN maintains offices in New York, and ESPN executives (including Mark Walker and Zack Malet) who principally led, and employees (including Alexandra Baiocco and Faith McCarthy)  who participated in, the partnership negotiations with SportsBubble did so in whole or in part from ESPN's New York office.

19.     Venue in this District is proper under 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b) and (c) because each Defendant is subject to this Court's personal jurisdiction, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

I.    **Sports Media Fragmentation**

20.     Live sporting events reach the screens of American consumers through a complex ecosystem of market participants.  Traditionally, this ecosystem had three major layers:  at the top were sports leagues like the NFL and NBA, which organized the sporting events themselves. In the middle were programmers—media companies like ESPN and FOX that licensed and produced the television shows surrounding the sporting event.  And at the bottom were distributors (also called multi-channel video programming distributors, or MVPDs) like cable and satellite companies, which transmitted the sporting events to consumers.  Monday Night Football, for example, features a football game organized by the NFL, licensed and produced

6

for television by ESPN, and transmitted to consumers by distributors like the cable company Charter Communications.

21.     For decades, this three-layer system dominated American television, and American consumers watched live sports by subscribing to a single, large bundle of television channels from a cable company.  Under this legacy cable TV model, viewers paid a single monthly fee for access to a wide range of channels, including live sports, news, and entertainment shows.

22.     While the cable model was simple, it had its drawbacks:  consumers paid for dozens of bundled channels they never watched and had little flexibility to pick and choose the channels, shows, or sporting events they actually wanted to watch and pay for.

23.     Over the past decade, consumers have changed how they watch television, and the television ecosystem has evolved with them.  High-speed internet has enabled online streaming services to bypass traditional cable conglomerates and offer live sporting events directly to consumers.

24.     As high-speed internet became widespread, consumer dissatisfaction with the high prices and rigid contracts of the cable model encouraged many consumers to seek alternatives.  These consumers are known as "cord-cutters," referring to those who have "cut the cord" of their cable boxes and now watch television and sports through online streaming.  The cord-cutting movement has seen consumers cancel their cable subscriptions in favor of internet-based streaming services like Netflix, Hulu, and Amazon Prime Video.  These platforms allow users to watch what they want, when they want, without subscribing to an expensive all-in-one cable bundle.

25.     The cord-cutting movement has disrupted the traditional three-layer cable ecosystem and allowed consumers to access sports from a host of different media companies and streaming services.  Programmers such as NBC and CBS have begun to bypass traditional distributors entirely by offering online "direct-to-consumer" ("DTC") services like Peacock (NBC) and Paramount+ (CBS).  Sports leagues themselves have likewise begun to offer their own DTC services, streaming their games on their own websites and platforms.  The NBA, for example, offers NBA League Pass, which allows subscribers to watch NBA games through the NBA's website and app, and the NFL offers NFL+, the league's DTC service allowing users to watch and listen to all of its games.  Tech companies like Amazon have also begun offering live sports through their own platforms like Prime Video, which offers live NFL games.  And new "virtual" MVPDs have challenged traditional distributors by offering "skinnier" sports-focused packages of channels online:  Fubo, for example, recently announced the launch of a "Sports & Broadcast service" that will include Disney's sports channels at a fraction of the price of traditional cable.  Accordingly, sports fans in the streaming era have a much greater variety of options for watching sporting events.

26.     While the cord-cutting movement has freed consumers from the cable bundle and given them more flexibility to decide which channels, shows, and sporting events they pay for, it has also created its own set of challenges for consumers in the form of media fragmentation.

27.     Media fragmentation refers to the proliferation of content across numerous platforms and channels, making it challenging for consumers to seamlessly discover and access all desired content.  In the realm of sports media, this fragmentation has become increasingly pronounced, with the media rights for various leagues and events spread across multiple networks and streaming services.  Consequently, fans often need to search the internet to find

sports viewing information and subscribe to several services to follow their favorite teams and sports, leading to increased complexity.

28.     The NFL provides a good example of sports media fragmentation.  Six major market participants now license the media rights to professional football games:  FOX owns the rights to NFC Sunday afternoon games; CBS owns the rights to AFC Sunday afternoon games; NBC owns the rights to Sunday night games; ESPN and ABC own the rights to Monday night games; Amazon Prime Video owns the rights to Thursday night games; and Google owns "NFL Sunday Ticket," which allows subscribers to view out-of-market NFL games on YouTube TV. Previously, an NFL fan could watch all of these games (except those on Sunday Ticket) simply by subscribing to a cable bundle—but in doing so, would end up paying for dozens of channels that the fan might never watch (like Lifetime TV or the Food Network).  Now, NFL fans can watch many of these games on streaming services for a fraction of the cost of cable, but will need to navigate between streaming services to find the specific games they want to watch.

29.     The need to navigate multiple platforms makes it challenging for viewers to find and watch the sports they are interested in.  A recent study found that 69% of avid sports fans feel that using multiple providers to watch the same sport is a hassle, and 59% say it has become more challenging to find the sports they want to watch.

30.     Thus, while the proliferation of virtual MVPDs, DTC options, and league streaming offerings have given cord-cutters more options for watching sports, it has also created headaches for cord-cutters by "fragmenting" sports media.  Instead of simply turning on a television and tuning in to the appropriate channel to watch a sporting event, a cord-cutter must first determine which streaming service is broadcasting the game and then ensure they have a subscription to that service.

31.     Large media companies have attempted to solve sports media fragmentation by trying to develop platforms that aggregate various options for watching live sports, but none has been widely successful.  In 2020, for example, YouTube began developing a "channel store" that would "allow users to subscribe to streaming services through the YouTube app."  YouTube predicted that it would launch its channel in 2022, but has not been successful; as of 2025, that channel store still has not launched.  Amazon, Apple, and Roku have also pursued plans to aggregate sports media content on a single platform, but none have yet offered a comprehensive solution to this problem.  Accordingly, sports media fragmentation continues to plague consumers; in a recent survey, more than two-thirds of fans indicated that they still struggled to access content, and only 19% of executives believed the industry was responding effectively to changing viewer habits.

32.     One major impediment to aggregating sports media content on a single platform is the technical challenge associated with creating a platform that effectively and seamlessly communicates with the numerous linear and online streaming services that offer live sports, each of which has its own unique system for communicating with other platforms.

33.     Online software services typically communicate with each other using an application programming interface, or API.  An API effectively serves as a bridge between different software systems, allowing them to exchange data and functionalities.  Integrating and communicating with an API can be complex and requires significant technical effort to accommodate various challenges, including compatibility, data sorting, authentication, error handling, rate limits, and performance.

34.     Different software services, including streaming services, use different programming languages and formats to communicate via an API, such as JSON, XML, and

Protobuf. The software systems that integrate with these APIs must correctly parse and serialize these formats. Inconsistent or unexpected responses can break data processing workflows. Additionally, APIs often require authentication using API keys, OAuth tokens, JWT (JSON Web Tokens), or Basic Authentication. Because streaming services manage authentication in different ways, managing token refresh, expiration, and revocation makes the task of consistently communicating with dozens of streaming services very complex.

35.     Beyond integrating with other services' APIs, creating a platform that aggregates sports media content is technically challenging because of the database management required to offer a reliable aggregation platform. Database management refers to the process of defining, manipulating, retrieving, and otherwise managing large volumes of data stored in a database to preserve its integrity, security, and accessibility. Database management in the context of a sports event platform requires a specialized kind of database (sometimes called an event database) that is optimized for storing, modifying, and retrieving data regarding real-time events instead of static data. Such a database must constantly adapt to changes in the live sporting schedule, including game delays, cancellations, and last-minute rescheduling, which occur frequently due to weather, injuries, or shifts in network programming. It is crucial that the database process and reflect those changes instantly so that fans do not miss any events and user trust is maintained. Handling those changes in real-time is technically complex: the platform must ingest changing data from multiple APIs, and reconcile and update that data across the app without error or delay.

36.     Database management in the sports media context is also particularly challenging because of the localized nature of many live sports. Sports fans in New York, for example, are primarily interested in watching New York sports. That means any effective platform must not

only track the full universe of live sporting events, but must also seamlessly filter and prioritize content based on each user's geographic location and preferences.

37.    ESPN itself has recognized that database technology and management is critical to an app that aggregates sports media content.  When ESPN announced the launch of its Where to Watch product, for example, its press release explained:  "At the core of Where to Watch is an event database created and managed by the ESPN Stats and Information Group (SIG), which aggregates ESPN and partner data feeds along with originally-sourced information and programming details from more than 250 media sources, including television networks and streaming platforms."

## II.    SportsBubble's Solution to Sports Media Fragmentation

38.    SportsBubble is a startup founded to solve sports media fragmentation by creating a platform that aggregates and curates sporting event schedules and viewing information from event stakeholders (*e.g.*, leagues, event owners, programming providers, distributors, and streaming services) and connects consumers directly to the services that offer the sports events they want to watch.

39.    SportsBubble was founded in 2018 by Lydia Murphy-Stephans, an Olympic speed skater who has held executive positions in sports media since 1986, beginning at ABC Sports.  Before founding SportsBubble, Ms. Murphy-Stephans served as President of the Pac-12 Networks, Executive Vice President of MSG Networks, President of Oxygen Sports, and Vice President of Programming & Acquisitions for ABC Sports.  Ms. Murphy-Stephans co-founded SportsBubble with Chris Fehring, an experienced software engineer who previously worked as the media systems engineer for Pixar, the Pac-12 Networks, and Vulcan and served as the design lead for the Pac-12 Network's innovative award-winning IP production model in 2013.

40.     For the past seven years, SportsBubble's singular focus has been to solve the sports media fragmentation problem by creating an easy-to-use platform for consumers that consolidates and curates sporting event schedules and viewing information from numerous event stakeholders, such as leagues, event owners, providers, distributors, TV networks, and streaming services.  Ms. Murphy-Stephans, Mr. Fehring, and a team of engineers and sports media veterans have devoted thousands of hours to create this platform.  They have overcome the technical challenges and complexities associated with aggregating information about professional, minor league, college, high school, Olympic, and e-sports events, and navigated the hurdles of communicating with the various services and platforms that offer viewing.

41.     SportsBubble's flagship product is a mobile and online app called WatchSports.  The WatchSports app helps users find what live sports are on and how to watch them, connecting users to the correct service based on their location and viewing preferences.  WatchSports provides a live (*i.e.*, constantly updating) schedule of sporting events, geo-targeted options for watching each event, and connection services to the platform or service that offers event viewing.  The WatchSports app lists a multitude of sports—both major and niche—including baseball, basketball, wrestling, hockey, gymnastics, and football, as well as bowling, billiards, rugby, and surfing.  The application offers a fast, intuitive search-to-watch experience:  Users can either consult the overall event guide to find the sport they want to watch, or search for a specific sporting event.  When a WatchSports user finds a sporting event they want to watch, the user can simply tap on that sporting event, and WatchSports provides that user with a list of options for watching that event.  For example, if a WatchSports user wants to watch a Sunday night NFL game, WatchSports will inform the user that they can view the game on NBC by

subscribing to Fubo (a virtual MVPD that includes NBC as a channel) or by subscribing to NFL+ (the NFL's DTC streaming service).

42.     The WatchSports app also connects users directly to the streaming services that broadcast the game they select through the app.  For example, if the NFL fan taps to watch the Sunday night game, the app will give them the option to select Fubo or NFL+ and then send them directly to that streaming service.  If the user does not already have a Fubo or NFL+ subscription, the user will be prompted to subscribe to watch the game.  If the user already has a subscription, they can seamlessly sign into their account to watch the game.  Additionally, users can customize their WatchSports app with the sports they follow, and WatchSports will deliver customized sports event information to the user based on those preferences.  WatchSports also detects the user's local market and offers the user the games that are available in that market.

43.     The functionality of the WatchSports app depends on SportsBubble partnering with the services that offer sports event viewing.  When SportsBubble partners with a sports event stakeholder (*e.g.*, a media company, programming provider, event owner, distributor, or sports league), the partner provides its sporting event information to SportsBubble through an API or other approved data sources.  Without an API, SportsBubble cannot access or process the necessary data to represent the partner's offerings in its WatchSports app.  Thus, a partner provided API (or other approved data source), is an essential component in SportsBubble's WatchSports business partnerships.

44.     SportsBubble does not charge consumers anything to use the WatchSports app. Instead, SportsBubble makes money through referral fees from event stakeholders.  Whenever a sports fan using the WatchSports app subscribes to a SportsBubble partner's streaming service to watch a sporting event, SportsBubble receives a referral fee from that service.  SportsBubble's

model is thus unique in that its value is entirely additive to the sports ecosystem. Unlike streaming platforms that compete for exclusive media licensing rights and seek to keep users within their own ecosystems by streaming events in their own apps, SportsBubble does not stream or embed any sports video content, nor seek to license sports media rights. Instead, SportsBubble acts as a neutral conduit—connecting users looking to watch a sporting event to the external streaming service that owns the rights to broadcast that event. It thus boosts traffic and engagement for those stakeholders without threatening their market position. And it does so while providing value to consumers without costing them a penny.

45.     SportsBubble has successfully partnered with numerous sports event stakeholders to offer those services directly to consumers through the WatchSports app. SportsBubble's business partners have included the NFL with NFL+, Amazon's Prime Video, the Pac-12 conference and Pac-12 Networks, Paramount+, FuboTV, DAZN, Athletes Unlimited, NWSL, LPGA, Twitch, YouTube, and U.S. Speed Skating. Many of those partnerships were made possible by the strength of Ms. Murphy-Stephans's connections and reputation, as a recognized powerhouse in the sports media space. SportsBubble's leadership and team gave the company credibility, allowing it to form high-level relationships that most early-stage startups cannot access. Each of these sports event stakeholders has recognized the value SportsBubble creates in connecting sports fans with the sporting events they seek.

46.     WatchSports is the product of years of development, research, and testing by SportsBubble. Throughout this period (and through today), SportsBubble has taken significant measures to guard the confidentiality of its technology and product. It requires all employees, consultants, and anyone given access to its confidential data to sign NDAs, and it uses state-of-

the-art security systems from Amazon Web Services and other proven technology vendors to protect its confidential data.

47.     SportsBubble began building a prototype of its WatchSports app in 2020.  One year later, it retained software and streaming experts to help construct a "beta" test of the WatchSports app with 100 iOS (*i.e.*, iPhone or iPad) users.  As it did with its employees, SportsBubble required all participants in the beta test to sign NDAs to preserve the confidentiality of SportsBubble's information.

48.     In August 2021, Apple approved the WatchSports app (beta version) for commercial release.  In May 2022, SportsBubble commercially released version 1.0 of WatchSports in the App Store for iPhone and iPad.  SportsBubble has continued to develop and release updates and new features for the WatchSports app since its initial commercial release.  The current version of WatchSports available on the App Store and Google Play is Version 2.06.8.

### III.    SportsBubble and ESPN Begin Negotiating a Partnership and Sign an NDA

49.     While SportsBubble has formed significant partnerships with sports leagues, programmers, and distributors, its goal has been to partner with one or more of the major traditional programmers that own sports rights.  Currently, there are five such major programmers (sometimes called the "Big Five"):  ESPN, FOX, NBC, CBS, and Warner Bros. Discovery.  In 2020, SportsBubble determined that partnering with one or more of these programmers was important to building its footprint and expanding access for sports fans. Accordingly, SportsBubble resolved to negotiate a partnership with one of these major programmers to create momentum toward building additional partnerships.  After SportsBubble secured a partnership with a large programmer such as ESPN, it would be better positioned to

obtain partnerships with more stakeholders, such as leagues, that broadcast events on that programmer's networks. That is because SportsBubble would be making it easier for a league's fan base to discover and access their events through SportsBubble's WatchSports application. While programmers generally maintain the exclusive rights to broadcast such events, SportsBubble would mitigate fragmentation issues through its free-to-consumer WatchSports application offering event search, where to watch information, and connection service to that programmer's platform.

50.     ESPN is one of the largest sports media companies in the world. It calls itself "the worldwide leader in sports," and ESPN's stated goal is to "serve sports fans, anytime, anywhere."

51.     ESPN is majority-owned by Disney and holds all of Disney's sports assets. The ESPN empire has included an array of video programming assets, including ESPN, ESPN International, ESPN2, ESPN3, ESPNews, ESPN PPV, ESPN Films, ESPN Deportes, ESPNU, ESPN+, ESPN Events, Longhorn Network, SEC Network, Big 12 Now, ACC Network, and ABC Sports.

52.     Because of its large presence in the sports world and its stated goal to "serve sports fans, anytime, anywhere," and Ms. Murphy-Stephans' longtime business relationships with Disney and ESPN executives, ESPN made a natural partner for SportsBubble. In 2020, SportsBubble prioritized and pursued a partnership with Disney and ESPN.

53.     The initial contact about a partnership was between Ms. Murphy-Stephans and Disney Chairman Robert Iger in 2020. Mr. Iger introduced Ms. Murphy-Stephans to Sean Corrigan, Disney's head of Corporate Strategy and Business Development, and Ms. Murphy-Stephans and Mr. Corrigan had a productive discussion about SportsBubble.

Mr. Corrigan then introduced Ms. Murphy-Stephans to ESPN's Chief Financial Officer, Bryan Castellani, via email.  Shortly thereafter, Mr. Castellani organized a meeting with Ms. Murphy-Stephans and ESPN executives including Mark Walker, Head of Business Development & Sports Innovation; Chara Lynn-Aguiar, Vice President of Strategy and Office of the Chairman;[1] and Justin Connolly, Head of Content Distribution, to learn more about SportsBubble.  Over the next several months, Ms. Murphy-Stephans had meetings with Mr. Walker and Burke Magnus, President of Programming and Original Content at ESPN.  Mr. Walker and Mr. Magnus expressed interest in SportsBubble but informed Ms. Murphy-Stephans that SportsBubble's WatchSports app was too early in its development and to come back when WatchSports was closer to being ready to release commercially.

54.    After SportsBubble released the beta of the WatchSports app in August 2021, SportsBubble's partnership discussions with ESPN resumed in September 2021.  Mr. Walker introduced Ms. Murphy-Stephans to Zack Malet, Senior Director of Business Development and Innovation at ESPN.  Going forward, Mr. Walker and Mr. Malet led ESPN's negotiations with SportsBubble.

55.    The contemplated partnership between SportsBubble and ESPN initially involved ESPN+, which is ESPN's DTC subscription-based streaming service that offers a variety of live sporting events including Major League Baseball (MLB), the National Hockey League (NHL), the United Soccer League (USL), and college sports.  Under the contemplated partnership, the approximately 40,000 sports events available exclusively on ESPN+ would be included in the

---

[1] Ms. Aguiar was Senior Vice President of ESPN Strategy from May 2021 to November 2023, then promoted to Executive Vice President and Chief Financial Officer of Research, Strategy and Office of the Chairman in October 2023, before ESPN launched its copycat product in August 2024.

WatchSports app, so that users could search, access, and be connected to the ESPN+ service for their preferred event.  To that end, ESPN was to provide SportsBubble with its ESPN+ API to enable the WatchSports app to list ESPN+'s sports events and connect sports fans to ESPN's platform for event viewing.  As part of this affiliate marketing partnership, ESPN would provide SportsBubble a referral fee for each WatchSports app user who subscribed to the ESPN+ service through SportsBubble.

56.    Soon after these discussions began, ESPN began requesting technical and proprietary information about SportsBubble's product, technology, and business model, purportedly so that ESPN could evaluate a potential partnership with SportsBubble.  This request was unusual:  in SportsBubble's history, no partner or prospective partner had requested such information to evaluate the partnership.  That is because such technical information is not necessary to evaluate a marketing partnership with SportsBubble.  From a technical perspective, all a SportsBubble partner needs to provide is an API with event schedules and viewing information.  SportsBubble's team handles the API integration with its technology to enable partnership functionality and services.  From a SportsBubble partner's perspective, the most relevant consideration is the referral fee for delivering a new subscriber and other economic terms that go into the deal.

57.    SportsBubble nevertheless obliged ESPN's requests for information about SportsBubble's technology and internal product architecture.  Because this information is highly confidential and reflects years of SportsBubble work, SportsBubble and ESPN signed an NDA to protect the confidential information SportsBubble provided.  The parties executed the NDA on September 8, 2021.

58.    The NDA's "Purpose" was for the "[p]arties [ ] to engage in discussions regarding the potential use by ESPN of SportsBubble's 'WatchSports' mobile application."  The NDA also recognized that SportsBubble would provide ESPN with confidential information that was "not generally known to the public" and "of a technical, business or other proprietary nature (including, without limitation, trade secrets, know-how, customer lists, business plans, and financial information)."  The NDA required that ESPN "only use the Confidential Information for the purposes of evaluating such Confidential Information and determining whether the Parties will pursue further negotiations with each other in Connection with the Purpose," and prohibited ESPN from using the information for any other purpose.  The NDA also prohibited ESPN from "disclos[ing] [SportsBubble's] Confidential Information to anyone (other than employees of [ESPN and its corporate affiliates] with a need to know) without the Disclosing Party's prior written consent."

59.    After executing the NDA, ESPN executives repeatedly expressed, both orally and in writing, intent to consummate a partnership with SportsBubble.  For example, in a February 8, 2022, email to Ms. Murphy-Stephans and Mr. Hopkins, Mr. Malet noted "ESPN's excitement to be a part of SportsBubble."  Based on these representations, SportsBubble believed that ESPN was genuinely interested in consummating a partnership with SportsBubble.

60.    SportsBubble and ESPN began to negotiate the terms of the partnership in phone calls, Zoom meetings, and emails.  ESPN made an initial proposal for business terms in October 2021 that included proposed referral fees SportsBubble would receive for customers who signed up for ESPN+ through the WatchSports app, as well as marketing terms.  In an email communicating this offer, Mr. Malet noted that ESPN thought this was "the best path to

achieving our mutual consumer-facing goals as well as provide a revenue generation source for Sport[B]ubble."

61.    After SportsBubble countered ESPN's initial offer, ESPN made a second offer on February 8, 2022, that largely "accept[ed] SportsBubble's counter referral fees for the first six months," and "reverted to [ESPN's proposed] pricing structure" after that.  ESPN recognized that, like the WatchSports product itself, these partnership terms were "brand new to the marketplace," and were "confidential[.]"  Key to the partnership was for "ESPN to share the new ESPN+ API to retrieve ESPN+ listings by 12/1/22."  At the time, Mr. Malet explained the new API should be ready in April, ahead of WatchSports' May release, and the December deadline was a contractual need since the API was being built.

62.    SportsBubble accepted the key terms in ESPN's February 8, 2022, proposed partnership agreement, and the parties proceeded along these terms for the remainder of the discussions between ESPN and SportsBubble.  While certain details in the partnership terms remained to be worked out, Mr. Malet indicated to Ms. Murphy-Stephans that ESPN did not intend to draw a hard line on those terms and would ultimately agree on those details.

## IV.    SportsBubble Provides ESPN Confidential Information About Its Product Pursuant to the NDA

63.    Relying on ESPN's expressed intentions, the all-but-final partnership agreement, and the NDA's protections, beginning in September 2021, SportsBubble shared a trove of confidential information about the technology it used to create WatchSports.  This included the complicated processes by which SportsBubble communicates with other firms, platforms, and services to aggregate, organize, and list sporting event information in a programming guide format, in near real-time, with geo-targeting, and in one place, so that consumers can watch sports on the services/platforms offering sports event viewing in that region of the country.

Notably, these processes represent the key technological challenges to developing an online sports marketplace.  Thus, information about such processes is highly valuable to anyone developing a competing product.  SportsBubble also shared highly confidential information about SportsBubble's business model and product roadmap, including planned future features, functions, and business offerings.  This information included SportsBubble's plans to make WatchSports available in a SaaS (Software as a Service) business model, as a licensed, customized fan engagement feature for its business partners' platforms.

64.     For example, in December 2022, SportsBubble and ESPN held a Zoom call where SportsBubble presented a slide show to ESPN executives regarding WatchSports, its technology, and the new features that SportsBubble was planning for the app.  This presentation included slides that contained the following trade secrets on slides that were marked "proprietary and business confidential":

a.   Technical details regarding SportsBubble's process for communicating with different business partners' APIs in order to "seamlessly ingest[] and integrate[] sports even schedule information at scale."

b.   Technical details regarding how SportsBubble synthesized sporting event data in a central database that used a specialized query language called GraphQL specifically designed for modern, API-based applications, instead of a more standard SQL or NoSQL database.  At the time, very few companies (if any) used GraphQL for this purpose, and SportsBubble's implementation of GraphQL represented a significant technical innovation.

c.   The internal architecture of SportsBubble's proprietary "Event Schedule Management System," a backend system that SportsBubble used to communicate

with partners, organize and synthesize data received from partners, and translate

that data into an easily digestible schedule that SportsBubble users could consult

to determine which services were offering a specific sporting event, including

screenshots of the management system itself.

d.  The planned features and design of the WatchSports app, which was still in beta

at the time, including mockups of the planned consumer-facing screens, the app's

planned release date, and features planned for future versions of the app.

e.  Specific data regarding the performance of the WatchSports app on the iOS

platform, which "enabled SportsBubble to monitor consumer engagement, track

usage, test at scale, discover and fix bugs, and most importantly, apply [its]

findings toward creating an even better app and user experience for WatchSports'

2023 release."  The results of this testing were eye-opening:  Among other things,

they showed that one in four users who selected to watch an event through a

SportsBubble partner ended up subscribing to that partner's service, delivering an

astronomical 25% customer conversion rate and proving that WatchSports'

product and technology worked and offered value to consumers and streaming

services alike.

65.     Each of the items of information described above is a protectible trade secret:

Each derives economic value from not being generally known to the public or to competitors of

SportsBubble, and each is the subject of reasonable efforts to maintain its secrecy.

66.     *First*, none of this information was known outside of SportsBubble and its

employees, consultants, and beta testers under NDA.  Indeed, as noted above, numerous

companies have attempted to develop a sports aggregation platform similar to WatchSports, but

none has been able to overcome the challenges associated with developing such a platform, which the information described above would have helped them address.

67.    *Second*, even within SportsBubble, this information was kept strictly confidential. All employees, consultants, and beta testers were required to sign NDAs, and employees who did not need to know about the technical details of SportsBubble's internal architecture did not know those details.

68.    *Third*, SportsBubble took significant steps to protect the secrecy of this information.  Beyond the NDAs that SportsBubble required all employees, consultants, and beta testers to sign, SportsBubble protected its information with state-of-the-art security services, signed an NDA with ESPN itself before sharing any of its confidential trade secrets, and stamped all of the slides of its December 2022 presentation "proprietary and business confidential."

69.    *Fourth*, the information contained in the presentation to ESPN conferred significant value on SportsBubble and its WatchSports product.  The information explained how SportsBubble overcame the challenges that several large media companies had encountered in trying and failing to develop a similar platform.

70.    *Fifth*, the information contained in the presentation to ESPN reflected millions of dollars and thousands of hours of research and development by SportsBubble's team of engineers and media executives.  Because WatchSports is SportsBubble's flagship product—indeed, the company was founded to build an application like WatchSports—the technical and proprietary information for the application is key to the value of SportsBubble's business.

71.    *Sixth*, the information contained in the presentation could not easily have been duplicated by others for the reasons already explained.  SportsBubble's team brings together talented engineers and seasoned sports executives, and its successful development of the

WatchSports app was possible only because of the close collaboration of these engineers and sports executives. Indeed, many other media companies have tried—and failed—to develop similar platforms, illustrating the difficulty of doing so independently.

72. Notably, the slides in the December 2022 presentation were not the only source of confidential trade secrets that SportsBubble conveyed to ESPN during this presentation: SportsBubble executives talked over the slides during the presentation, elaborating on their content by providing additional confidential details about SportsBubble's product, business model, and technology, and responding to questions from ESPN executives about the slides. The information provided by SportsBubble executives concerning these slides, like the information contained in the slides themselves, constitute protectible trade secrets for the reasons stated above.

73. The presentation described above is just one example of a presentation containing confidential trade secrets that SportsBubble delivered to ESPN under the protections of the NDA. Between September 2021 and March 2023, SportsBubble and ESPN had over a dozen additional Zoom meetings, as well as calls and emails, in which executives discussed additional confidential aspects of the SportsBubble product and technology. For example, SportsBubble executives also relayed the processes used to create geolocation functionality on the platform that integrates live location data. SportsBubble also conveyed the business and pricing terms offered to partners of the WatchSports app. As ESPN acknowledged, those terms were new to the market due to SportsBubble's novel role as a conduit between streaming services, reflected internal business strategy, and were critical to SportsBubble's competitive advantage. During these meetings, SportsBubble communicated to ESPN that the information SportsBubble was sharing was confidential (and stamped all slides and documents containing such information

"proprietary and business confidential"), and ESPN executives agreed and repeatedly expressed enthusiasm regarding SportsBubble's technology and the prospective partnership between ESPN and SportsBubble. The information provided by SportsBubble executives concerning these aspects of SportsBubble's product and technology also constituted protectible trade secrets, for the reasons stated above.

74.     ESPN also requested direct access to the beta version of SportsBubble's WatchSports app prior to its commercial release. The beta version of WatchSports demonstrated the planned features and functionality of the product, which were confidential. Indeed, for this reason, SportsBubble required all beta testers to sign strict NDAs before testing the app in beta. Because ESPN had also signed an NDA, SportsBubble agreed to ESPN's request to access the SportsBubble beta.

75.     ESPN executives involved in discussions with SportsBubble shared SportsBubble's information outside the immediate ESPN team negotiating the partnership, telling SportsBubble that they shared that information so that other executives and departments at ESPN could evaluate or provide feedback about the potential partnership. For example, in a December 8, 2021, email, Mr. Malet stated that he had received feedback on SportsBubble's proposal from "Platform Distribution," "Disney Operations," "ESPN Programming," and "ESPN Business." Many senior executives from Disney and ESPN either participated in or had knowledge of ESPN's discussions with SportsBubble, including Mark Walker, Burke Magnus, Kevin Lopes, Chara-Lynn Aguiar, Robert Iger, Jimmy Pitaro, Sean Corrigan, Justin Connolly, and Bryan Castellani.

76.     At no time during any of these discussions, from September 2020 to March 2023, did anyone from Disney or ESPN disclose they were developing a WatchSports-like product

with a SportsBubble-like business model.  Had ESPN disclosed this intention, SportsBubble

would have taken a far different approach to its discussions with ESPN (as well as its discussions

with other prospective business partners), and it certainly would not have shared the confidential

information that it did.  Instead, SportsBubble would have terminated its discussions with ESPN

and would have immediately pursued a partnership with a rival flagship media company, such

as NBC or CBS.

## V.    ESPN Repeatedly Delays Consummating the Partnership Without Meaningful Explanation

77.    After SportsBubble provided ESPN the requested confidential technical

information and agreed to ESPN's proposed affiliate marketing partnership agreement, the

parties appeared very close to consummating a partnership by February 2022.  Except for

finalizing a few terms (which Mr. Malet had informed SportsBubble that ESPN would ultimately

agree to), all that was needed to cross the finish line was for ESPN to deliver its ESPN+ API to

SportsBubble to integrate with the WatchSports app.  Based on SportsBubble's experiences with

all of its other partners, this is a very simple step:  SportsBubble has spent years developing a

system that can communicate with any API, and SportsBubble's executives and engineers are

well versed in API integration.  Accordingly, integrating with a partner's API typically takes

only a few days to a few weeks at most, and SportsBubble has never had an issue integrating

with any partner's API.

78.    ESPN, however, began raising vague issues regarding building and delivering its

API to SportsBubble for integration with WatchSports.  ESPN repeatedly used such excuses to

delay the consummation of the partnership.  And while SportsBubble waited over one year for

ESPN to deliver its ESPN+ API, ESPN made a series of false, contradictory, or unexplained

statements regarding its API build and delivery that prevented SportsBubble from consummating a partnership with ESPN.

79.     Originally, ESPN stated that it licensed an API from third-party service provider Gracenote to provide event scheduling information.  That explains why, in the first proposed partnership agreement, ESPN proposed that SportsBubble integrate with ESPN's Gracenote API to receive scheduling information.  In a November 4, 2021, email, for example, Mr. Malet informed SportsBubble's Chief Technology Officer, Chris Fehring, and SportsBubble's Head of Partnerships, Art Marquez, that a "Gracenote integration is the unequivocal best route forward" for an ESPN/SportsBubble partnership.  SportsBubble told ESPN that ESPN+'s Gracenote API was acceptable, as the SportsBubble team was familiar with and had successfully integrated Gracenote's APIs into the WatchSports app for other business partners.

80.     But just one month later, on December 14, 2021, ESPN—through Mr. Malet— reversed course, informing Mr. Marquez on a Zoom call that ESPN could not share its Gracenote API and that SportsBubble itself would have to pay to license ESPN+'s API from Gracenote. SportsBubble immediately informed ESPN this was a non-starter.  As SportsBubble had advised ESPN in October 2021 (and as ESPN had agreed), a key business term for a SportsBubble partnership was for the partner to provide its API (or other approved data source) to enable integration and operations with WatchSports.  SportsBubble does not license its business partners' API.  ESPN's sudden reversal also made no sense:  ESPN, like virtually all other large event stakeholders and streaming services, already owns or licenses its API through Gracenote for various operational needs.  Thus, proposing that SportsBubble itself license ESPN's API from Gracenote on behalf of ESPN to service ESPN was nonsensical.  ESPN's new position puzzled SportsBubble's executives, who explained that SportsBubble could easily integrate

ESPN's existing Gracenote API and inquired why ESPN was unable, or unwilling, to provide it after it had already agreed to do so. At the time, SportsBubble's then-current partners, FuboTV and Pac-12 Networks, also used Gracenote APIs and simply shared them directly with SportsBubble. Despite SportsBubble's requests for an explanation and attempts to resolve the issue, to this day ESPN has never explained why it was unable or unwilling to provide its Gracenote API to SportsBubble.

81.     As the parties were discussing this issue, ESPN threw another curveball: Mr. Malet informed Mr. Hopkins on a February 2, 2022 Zoom meeting that ESPN no longer planned to use the Gracenote API but was instead developing and building its own proprietary API for ESPN+, which ESPN would use to deliver sports scheduling information to WatchSports. However, after informing SportsBubble about this new ESPN+ API plan, ESPN repeatedly delayed the rollout of that API, again without meaningful explanation.

82.     Mr. Malet originally stated that ESPN expected to deliver this new ESPN+ API in April 2022, ahead of WatchSports' anticipated May launch of version 1.0 in the App Store. But as the date neared, Mr. Malet informed Mr. Hopkins that the build was running behind schedule and ESPN would not make that deadline. He did not explain the reason for this delay. Delivery promises for June, August, and October dates were also delayed. At one point during this period, Mr. Malet and ESPN executives insisted in conversations with Mr. Hopkins that ESPN would provide the API by August 2022 because ESPN wanted to ensure that college football—a major asset for the network—was featured on the WatchSports app, particularly given that SportsBubble had already partnered with the Pac-12 Conference. Yet despite those insistences, August came and went with no delivery.

83.    The partnership agreement that ESPN proposed in February 2022 (to which SportsBubble agreed) included as a term of the agreement that the ESPN+ API would be ready no later than December 1, 2022.  Then, in November 2022, after 10 months of updating SportsBubble executives about the delayed status of this API, Mr. Malet informed SportsBubble's Keith Hopkins, in a phone call, that the "new ESPN+ API was not built."  ESPN gave no reason for the delayed rollout of the new ESPN+ API.  ESPN also never explained why the parties could not simply go back to the original plan of ESPN using a Gracenote API to deliver sporting event information to SportsBubble.

84.    Throughout this period, ESPN still expressed interest in pursuing the partnership: on an August 24 Zoom meeting, for example, Mr. Malet expressed apologetic sentiments to Mr. Hopkins and began negotiating the possibility of including Disney-owned streaming service Hulu and ESPN's Linear Networks in the partnership.  But ESPN's purported technical challenged with integrating its API continued without explanation.

85.    After months of repeated and unexplained delays, Ms. Murphy-Stephans called Mr. Walker to inquire about the reasons for the delays, concerned that the repeated delays in the delivery of this API had not only stalled ESPN from consummating the agreed-upon business partnership, but had also prevented SportsBubble from securing other partnerships with leagues that had events available for viewing on ESPN's platforms.  Those leagues were waiting on the SportsBubble-ESPN partnership to be operational before inking their own SportsBubble partnerships.  On the call, Mr. Walker was apologetic, attributed the delays to a reorganization that Disney and ESPN were undergoing, and stated that the new structure would enable better business communications going forward.  Mr. Walker indicated he would set time with the group to get business back on track in early 2023 and continue moving toward a partnership.

30

Ms. Murphy-Stephans, in an effort to accommodate ESPN's purported technical development challenges, offered SportsBubble's services to build the API for ESPN+ and ESPN's other platforms.  ESPN never responded to SportsBubble's offer.  In January, after the reorganization was publicly announced, Ms. Murphy-Stephans called Mr. Walker again to follow up on the delivery of the API.  He again reassured her that ESPN just needed a few weeks to get up to speed under their new structure, and that they would soon resume developing their API and continue negotiations.  He also reaffirmed Disney's and ESPN's interest in a partnership with SportsBubble.

86.    Throughout 2022, while ESPN continued to inexplicably delay the delivery of their API, Mr. Walker and Mr. Malet continued to engage SportsBubble in friendly communications, and the parties continued to discuss the few non-controversial business terms that remained open.  The parties also discussed expanding the partnership to include Hulu's sports events, in addition to those on ESPN+.  No one at Disney or ESPN informed SportsBubble that ESPN would soon announce a product that replicated SportsBubble's functionality and purpose.

## VI.    ESPN Launches a Copycat Product

87.    On March 2, 2023, more than a year after the parties signed the NDA and SportsBubble began providing sensitive and confidential information to ESPN regarding its WatchSports app, nearly a year after ESPN had originally stated that it would deliver its API to SportsBubble to finalize the partnership, and during the time frame when Mr. Walker represented he would get business back on track between ESPN and SportsBubble, SportsBubble learned through public reporting that ESPN was developing its own competing product to

aggregate fragmented sports media content on a single platform, called "ESPN Where

to Watch."

88.     ESPN's Where to Watch product is a virtual carbon copy of WatchSports.  Like

WatchSports, Where to Watch is "a guide in [a mobile] app that will tell you where every

sporting event is airing that day" that "includes all games - broadcast, cable, RSNs, and

streaming services" and allows fans to "click directly into each game."  And like WatchSports,

Where to Watch "automatically ingest[s] and display[s]" data from third-party platforms "in the

ESPN app and online."  In other words, the Where to Watch product is a virtual carbon copy of

SportsBubble's WatchSports product, using precisely the technology that SportsBubble

provided and described to ESPN during the parties' detailed confidential negotiations.  The

CNBC story that announced Where to Watch in March 2023 explained Disney's ambitious goal

for the product:  "Disney's ESPN wants to be the hub for all live sports streaming — even for

its competition."

89.     The CNBC story announcing Where to Watch also indicated that ESPN had been

developing this product for some time:  ESPN had already "held conversations with major sports

leagues and media partners about launching a feature on ESPN.com and its free ESPN app that

will link users directly to where a live sporting event is streaming."  None of this was disclosed

to SportsBubble during the parties' lengthy discussions about WatchSports over the previous

eighteen months.

90.     Immediately after the public announcement of ESPN's planned app, SportsBubble

received a flood of calls from confused partners, who believed that ESPN's announced product

was the result of its partnership with SportsBubble.  These partners noted that ESPN's

announced product was identical to the product SportsBubble had spent years developing.  At the

time of ESPN's announcement, SportsBubble was raising capital at a $25 million valuation and in active conversations with many leagues that were enthusiastic about partnering with SportsBubble. Immediately after ESPN's public announcement, SportsBubble's lead investor prospect informed Ms. Murphy-Stephans that they would no longer proceed with their planned investment, explaining that the launch of a copycat product by a major conglomerate before SportsBubble had the chance to fully launch had diminished SportsBubble's perceived value. League partnerships also fell through for similar reasons. SportsBubble's leadership had to abandon its capital raise and continue self-funding.

91.     ESPN's attitude towards SportsBubble and the partnership also abruptly changed after the public announcement of ESPN's competing app. When Ms. Murphy-Stephans contacted ESPN executives to learn if SportsBubble was a part of ESPN's future plans, Mr. Malet sent Ms. Murphy-Stephans an email on a March 16, 2023 stating that "it doesn't make sense to have more deal discussions about us providing ESPN+ affiliate terms," because "it doesn't sound like our channel listing integrations (e.g., Gracenote, excel schedules) work with your product." Mr. Malet's statement was false: SportsBubble had informed ESPN many times that it could easily integrate with a Gracenote API. It also represented yet another reversal of ESPN's position on which API it was using: Mr. Malet made no mention of any ESPN+ API and instead reverted to ESPN's original proposal in November 2021 of using a Gracenote API.

92.     ESPN executives also reversed course on their earlier expressions that they were moving full steam ahead towards a partnership with SportsBubble. In contrast to "ESPN's excitement to be a part of SportsBubble" that Mr. Malet expressed in February 2022, and the similar enthusiasm that ESPN executives conveyed during multiple phone calls and Zoom meetings over the previous eighteen months, Mr. Walker wrote in a March 24, 2023 email that

33

"since the inception of our conversations," ESPN had "no interest in a 'strategic partnership' with SportsBubble." No one at ESPN or Disney had ever previously conveyed this sentiment to SportsBubble; to the contrary, prior to the public announcement of ESPN's competing product, ESPN executives had uniformly expressed enthusiasm for the WatchSports app, excitement at the prospect of a partnership, and assurances that they were actively making progress towards consummating the partnership.

93.    The timing of the public announcement of ESPN's competing app was also notable. This announcement did not say when ESPN actually planned to launch its Where to Watch app, nor did the announcement appear to coincide with any specific event or milestone in the development of ESPN's competing app (which had apparently been in development for some time). But it did follow very closely after SportsBubble presented ESPN with confidential technical information about WatchSports' product.

94.    In August 2024, ESPN officially launched its Where to Watch product, which was a virtual clone of WatchSports. As an ESPN press release stated: "At the core of Where to Watch is an event database created and managed by the ESPN Stats and Information Group (SIG), which aggregates ESPN and partner data feeds along with originally-sourced information and programming details from more than 250 media sources, including television networks and streaming platforms." That is exactly the functionality behind the WatchSports app, and exactly the functionality that SportsBubble conveyed and explained to ESPN during the partnership negotiations.

95.    Although ESPN's Where to Watch app was a copycat of WatchSports, ESPN publicly took credit for coming up with the idea for the app. At an ESPN event announcing the launch of the product, senior ESPN executive Ms. Aguiar claimed that the idea for Where to

Watch arose when ESPN CEO Jimmy Pitaro asked why he couldn't find the Yankees games on television.  In reality, both Ms. Aguiar and Mr. Pitaro had direct knowledge of SportsBubble, its WatchSports product, and its negotiations with ESPN.

96.     ESPN's false claims that it invented and developed the Where to Watch app from scratch had a predictable and immediate effect:  Media outlets began crediting ESPN with SportsBubble's idea and praising ESPN's ingenuity.  One news outlet commended Where to Watch for being the "first of its kind" application.

97.     Almost immediately, ESPN's copycat product enjoyed significant growth. According to an October 2024 article, "five million unique users have tuned into Where to Watch" in the two months since its launch.  The success of ESPN's copycat app underscores WatchSports' commercial potential and shows that, left unaddressed, ESPN will continue to be unjustly enriched by its unlawful conduct against SportsBubble.

98.     On information and belief, ESPN used confidential information that SportsBubble shared during partnership negotiations to develop its Where to Watch product.  Although SportsBubble has no access to ESPN's internal communications and thus, until discovery is complete, cannot know for certain what information ESPN used and when, substantial evidence supports an inference of misuse by ESPN:

99.     *First*, ESPN's Where to Watch product is a virtual carbon copy of SportsBubble's WatchSports product.  It replicates WatchSports' exact functionality, which took WatchSports years to develop, test, and perfect.

100.    *Second*, aside from ESPN's copycat product, the WatchSports app is the only one of its kind on the market; one media report described Where to Watch as a "first of its kind" product.  As noted above, several large companies (including Google, Amazon, and Roku) have

35

attempted to develop sports aggregation services, but none has successfully offered a product like WatchSports. It is therefore unlikely that ESPN derived any confidential information about Where to Watch from another source.

101.    *Third*, the ESPN team that negotiated the SportsBubble partnership shared information about SportsBubble widely within ESPN—in violation of the NDA—and numerous ESPN departments and senior ESPN executives had knowledge of the ESPN-SportsBubble partnership negotiations. The senior Disney and ESPN executives with knowledge of the ESPN-SportsBubble negotiations include Mark Walker, Burke Magnus, Kevin Lopes, Chara-Lynn Aguiar, Robert Iger, Jimmy Pitaro, Sean Corrigan, Justin Connolly, Bryan Castellani, and Scott Connor (ESPN, Executive Director and Product Manager for ESPN and ESPN+). These executives span several key business strategy, product development, and sports content teams within ESPN and Disney including: ESPN Business Development & Innovation (Walker), ESPN Programming and Original Content as well as Content Distribution (Magnus and Connolly, respectively), ESPN Sports Business Development & Innovation (Lopes), ESPN Strategy (Aguiar), ESPN and Sports Content (Pitaro), Disney Corporate Strategy and Business Development (Corrigan), and ESPN Finance (Castellani). Those teams would have ostensibly been involved in, or at minimum aware of, ESPN's development of a copycat sports media product. Additionally, ESPN notified SportsBubble that the Disney/ESPN departments who received information about the SportsBubble negotiations include Platform Distribution, Disney Operations, ESPN Programming, and ESPN Business. Many of these executives and departments would also have been involved in (or would, at least, have had knowledge of) ESPN's development of Where to Watch. Indeed, Ms. Aguiar and Mr. Pitaro both attended the media day in August 2024 where ESPN announced Where to Watch, and Ms. Aguiar publicly

claimed that she and Mr. Pitaro helped come up with the idea for Where to Watch. The widespread knowledge about SportsBubble and its product within ESPN and Disney—combined with the overlap between the Disney and ESPN executives involved with SportsBubble and ESPN's Where to Watch—supports an inference that SportsBubble's information was shared across these teams, including to those responsible for building ESPN's copycat product.

102.    *Fourth*, ESPN's keen interest in SportsBubble's technology and its requests for detailed information about SportsBubble's technology throughout the partnership negotiations were both unusual—no other prospective SportsBubble partner has ever asked for this information—and unnecessary to consummate the ESPN-SportsBubble partnership. The unusual and unnecessary nature of these requests support an inference that the intent of these requests was not to evaluate a SportsBubble partnership but to obtain information that would be useful in ESPN's development of its own competing product.

103.    *Fifth*, during the partnership negotiations, ESPN executives withheld from SportsBubble that ESPN was developing a competing product. This fact would have been highly relevant to SportsBubble as it decided whether to share its confidential information with ESPN, or even whether to pursue a partnership with ESPN at all. The fact that no one at ESPN disclosed this fact to SportsBubble over the course of the negotiations suggests that ESPN understood that its own Where to Watch product would directly compete with SportsBubble's WatchSports product.

104.    *Sixth*, ESPN repeatedly expressed enthusiasm about SportsBubble's product and that it was pushing full steam ahead towards consummating the partnership throughout the negotiations, only to abruptly change its tone after the public announcement of ESPN's copycat product. ESPN's recent statements indicate that its expressed interest in partnering with

SportsBubble was feigned.  Indeed, Mr. Walker's statement in the March 2023 that ESPN had "no interest" in a SportsBubble partnership "since the inception of our conversations" is a particularly damning omission that ESPN's earlier enthusiasm was artificial.  These facts suggest that the real purpose of ESPN's discussions with SportsBubble was not to consummate a partnership but to extract valuable information for use in developing ESPN's own product.

105.    *Seventh*, ESPN made false and contradictory statements about purported technical issues with its API, which had the effect of delaying the consummation of the ESPN-SportsBubble partnership until ESPN could announce the launch of its own competing product.  ESPN originally proposed using its own Gracenote API; then reversed course and claimed (without explanation) that it could not share its API with SportsBubble; then changed course again and stated that it was developing its own API that would be ready ahead of SportsBubble's launch in April 2022; then delayed the rollout of this API until December 1, 2022; then missed that deadline and blamed the delay on the company's structural reorganization; and finally, after the public announcement of its competing product, falsely claimed that it could not partner with SportsBubble because Gracenote "did not work with" SportsBubble's WatchSports.  ESPN's claim that it could not timely develop its own ESPN+ API also makes little sense given that ESPN announced the launch of Where to Watch in March 2023, while still insisting it lacked an API.  By that point, ESPN had already been pitching its copycat to potential partners—something that would have been implausible without a functioning API in place.  These contradictory, false, or misleading statements suggest that ESPN did not have a genuine interest in partnering with SportsBubble and instead was attempting to run out the clock on consummating a partnership until ESPN could develop its own competing product.

## VII.    ESPN's Conduct Has Harmed SportsBubble

106.    Defendants' conduct has harmed SportsBubble in myriad significant ways.

107.    *First*, on information and belief, Defendants' misuse of SportsBubble's confidential information to develop a competing app constitutes a direct misappropriation of SportsBubble's intellectual property, sapping the value of SportsBubble's technology and business model for ESPN's direct benefit.

108.    *Second*, Defendants' feigned interest in a SportsBubble partnership—and its efforts to string SportsBubble along in these negotiations for more than eighteen months—led SportsBubble to commit significant time and resources to negotiating a partnership with ESPN. These negotiations carried a serious opportunity cost in the form of forgone opportunities to partner with other streaming services and media companies, because (1) SportsBubble is a small, resource-constrained startup that can only devote attention to negotiating a limited number of partnerships at once; (2) an ESPN partnership would materially affect SportsBubble's strategies in deciding which other companies to partner with; and (3) an ESPN partnership could have materially changed the terms on which SportsBubble partnered with other media stakeholders. For each of these reasons, SportsBubble's negotiations with Defendants caused SportsBubble to pause its discussions with many other event stakeholders.  Had Defendants told SportsBubble up front that they were developing a competing product and/or had no interest in partnering with SportsBubble (as Mr. Walker finally admitted in March 2023), SportsBubble would have pursued and consummated partnerships with other large media companies, such as NBC, FOX, and CBS, which would have allowed SportsBubble to capture a larger portion of the market sooner, before ESPN brought its own product to market.  Indeed, SportsBubble had planned to devote significant resources to pursuing a partnership with NBC if an ESPN partnership did not

come to fruition.  Such a partnership with NBC likely would have unlocked many additional partnerships, including with various Olympic sport national governing bodies with events exclusively on NBC's networks and its Peacock streaming service.  In effect, Defendants kept SportsBubble on the sidelines of the market for eighteen months while their executives repeatedly feigned enthusiasm for SportsBubble's product, until Defendants could finally announce the launch of their own competing product.

109.  *Third*, Defendants' fraudulent misappropriation of SportsBubble's trade secrets has allowed them—a sports media conglomerate much larger than SportsBubble—to launch a competing product while saving substantial development costs and time.  Indeed, SportsBubble spent years and over $10 million developing this technology through resource-intensive iteration and innovation, and could only do so through a uniquely qualified team with deep expertise at the intersection of sports, media, business and technology.  Defendants' misappropriation thus tilts the competitive playing field even further in Defendants' direction by allowing Defendants' to free-ride on a competitor's product and technology and to gain an unfair advantage in securing subscribers that would have reasonably been expected to go to SportsBubble, the only other player in the market.

110.  *Fourth*, Defendants' misconduct, both individually and collectively, diminished SportsBubble's value, ability to obtain funding, and market share.  Defendants' misconduct caused SportsBubble to lose a promising capital raise at a $25 million valuation; the lead investor withdrew upon the announcement of ESPN's copycat product, expressly citing the timing of the product's launch.  The loss of that critical funding prevented SportsBubble from being able to pursue additional partnerships or to continue improving its product.  Further, SportsBubble's value and business plan turned on its unique advantage as the first mover in the

sports media aggregation market, particularly because WatchSports helped solve the omnipresent problem of sports media fragmentation. That advantage positioned SportsBubble to rapidly secure strategic partnerships and build lasting user loyalty. Given the complexity of the WatchSports concept and technology, it would likely have taken competitors years to enter the market, absent misappropriation. By that time, SportsBubble had planned to, and was poised to, leverage that head start to improve its user experience, obtain partnerships across the sports media landscape, and establish itself with millions of users.

111.    *Fifth*, Defendants' misconduct, both individually and collectively, has decreased the value and expected value of SportsBubble's existing partnerships with sports leagues, programmers, distributors, and other stakeholders, and reduced SportsBubble's goodwill with those partners.

## COUNT ONE
## <u>Violation of the Federal Defend Trade Secrets Act,</u>
## <u>18 U.S.C. § 1832 *et seq.*</u>

112.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

113.    Defendants are corporations engaged in interstate trade and commerce throughout the United States.

114.    SportsBubble's products and services, including its WatchSports application, are used and intended for use in interstate commerce.

115.    During all relevant time periods, SportsBubble possessed valid trade secrets regarding (1) the methods by which SportsBubble communicates and integrates with APIs of different streaming services, (2) the internal architecture and technology of SportsBubble's product (including the structure and implementation of its GraphQL database, Event

Management System, and geolocation functionality), (3) the planned features of its WatchSports app, (4) the results of its beta testing of the WatchSports app, and (5) its business model and partnership terms, which include its pricing strategies and terms.

116.    These trade secrets derive independent economic value by virtue of not being generally known to the public, nor readily ascertainable through proper means by SportsBubble's competitors, which can profit from their use or disclosure.

117.    SportsBubble took all reasonable efforts to protect and maintain the secrecy of its trade secrets, including, among other things, by requiring its employees, consultants, and anyone given access to its confidential data to sign strict NDAs, and using state-of-the-art security systems to protect its confidential data.

118.    Defendants knew, or had reason to know, that they improperly acquired SportsBubble's trade secrets—and continued to improperly obtain such information throughout the negotiation period—through their repeated misrepresentations and omissions to SportsBubble.

119.    Defendants' knowledge of SportsBubble's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy, as evidenced by, among other things, their execution of the NDA.

120.    On information and belief, Defendants knowingly and willingly misappropriated and misused these trade secrets by (1) wrongfully acquiring them under false pretenses, (2) using them to develop a nearly identical product that directly competes with SportsBubble's WatchSports app, (3) using them to plan the announcement of ESPN's near-identical competing product to undercut and preempt SportsBubble's standing in the market, and (4) wrongfully disclosing them to Disney employees who were not involved in Disney's negotiations with

SportsBubble.  SportsBubble did not provide express or implied consent to these uses or disclosures.

121.    At the time of the aforementioned acquisitions, disclosures, and uses, Defendants and their executives who acquired, misused, and disclosed the trade secrets knew, or had reason to know, that SportsBubble's trade secrets were acquired through improper means and under circumstances giving rise to a duty of secrecy.

122.    This conduct violates the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq*.

123.    As a consequence of the foregoing, SportsBubble has been and will continue to suffer damages, loss of competitive position, and irreparable harm.

124.    Because Defendants' DTSA violations were, and continue to be, willful and malicious, SportsBubble is entitled to attorney's fees, as well as exemplary (i.e., punitive) damages of twice the amount of compensatory damages.

## COUNT TWO
## Misappropriation of Trade Secrets,
## State Common and Statutory Law

125.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

126.    The conduct alleged in Count One constitutes unlawful misappropriation of trade secrets under New York common law.  In the first alternative, the conduct alleged in Count One constitutes unlawful misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. Ann. § 35-50 *et seq*.  In the second alternative, the conduct alleged in Count One constitutes unlawful misappropriation of trade secrets under the California Uniform Trade Secrets Act, Ca. Civ. Code § 3426 *et seq*.

127.    As a consequence of the foregoing, SportsBubble has been and will continue to suffer damages, loss of competitive position, and irreparable harm.

128.    Because Defendants' violations were and continue to be willful and malicious, SportsBubble is entitled to punitive damages to the extent permitted by law.

**COUNT THREE**
**Breach of Contract – Non-Disclosure Agreement,**
**State Common Law**

129.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

130.    On September 8, 2021, SportsBubble and ESPN entered into a written NDA.

131.    The NDA is a valid, binding contract between SportsBubble and ESPN. SportsBubble has performed all of its obligations under the contract.

132.    The NDA provides that ESPN "will not disclose the Disclosing Party's Confidential Information to anyone (other than employees of [ESPN and its affiliates] with a need to know) without [SportsBubble's] prior written consent."  The NDA further provides that ESPN "will take all reasonable measures to avoid disclosure of [SportsBubble's] Confidential Information, including, at a minimum, those measures it takes to protect its own Confidential Information."  The NDA further provides that ESPN "will only use the Confidential Information for the purposes of evaluating such Confidential Information and determining whether the Parties will pursue further negotiations with each other in connection with the Purpose" of the NDA.

133.    ESPN breached the NDA by (1) using SportsBubble's Confidential Information for purposes other than evaluating such confidential information and determining whether the Parties will pursue further negotiations with each other in connection with the purpose of the NDA, (2) disclosing SportsBubble's Confidential Information to ESPN and Disney employees

and consultants who had no need to know them, and (3) failing to take all reasonable measures to avoid disclosure of SportsBubble's Confidential Information.

134.    SportsBubble has been and will continue to be damaged by ESPN's breach of the NDA.

**COUNT FOUR**
**Breach of the Implied Covenant of Good Faith and Fair Dealing,**
**State Common Law**

135.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

136.    The NDA is a valid, binding contract between SportsBubble and ESPN. SportsBubble has performed all of its obligations under the contract.

137.    The NDA, like all contracts, has an implied covenant of good faith and fair dealing, which provides that all parties to the contract will act in good faith to further the purpose of the contract.

138.    The NDA states that its "Purpose" of the contract is for SportsBubble and ESPN to "engage in discussions regarding the potential use by ESPN of SportsBubble's 'WatchSports' mobile application." The NDA also recognizes that SportsBubble would provide ESPN with confidential information that was "not generally known to the public" and "of a technical, business or other proprietary nature (including, without limitation, trade secrets, knowhow, customer lists, business plans, and financial information)," and provided that ESPN would "only use the Confidential Information for the purposes of evaluating such Confidential Information and determining whether the Parties will pursue further negotiations with each other in Connection with the Purpose."

45

139.    ESPN did not act in good faith to further the purpose of the NDA.  To the contrary, ESPN never intended to—and did not—engage in good-faith discussions with SportsBubble regarding the potential use by ESPN of SportsBubble's WatchSports app.  Instead, ESPN used the negotiations, and the Confidential Information obtained therein, to create a copycat product and gain a competitive advantage, soliciting SportsBubble's potential partners and users to itself, while keeping SportsBubble on the sidelines locked in negotiations that ESPN knew would be fruitless.  This bad faith conduct damaged SportsBubble's business and standing in the marketplace.  ESPN's conduct thus unreasonably frustrated the NDA's core purpose and deprived SportsBubble of the benefit of its bargain.  ESPN accordingly violated the covenant of good faith and fair dealing implied in the NDA.

140.    SportsBubble has been and will continue to be damaged by ESPN's violation of the covenant of good faith and fair dealing implied in the NDA.

## COUNT FIVE
## Unjust Enrichment,
## State Common Law

141.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

142.    SportsBubble provided Defendants with numerous benefits during the negotiation of the partnership between SportsBubble and ESPN, including without limitation the following:

143.    *First*, during discussions over the partnership between SportsBubble and ESPN, SportsBubble provided confidential trade-secret information to Defendants that, on information and belief, Defendants used to develop their own competing product.

144.    *Second*, during discussions over the partnership between SportsBubble and ESPN, SportsBubble provided other information and technical assistance that, if it does not rise to the

level of a trade secret, still benefited Defendants in developing a competing product or in their business more generally.

145.    *Third*, SportsBubble's protracted discussions and negotiations with ESPN regarding a partnership benefited Defendants by preventing SportsBubble from consummating partnerships with other streaming services and otherwise expanding its business, thus allowing Defendants additional time to announce their own competing product and more easily capture the market.

146.    SportsBubble has been impoverished by conferring these benefits on Defendants. Among other injuries, the value of SportsBubble's company, product, and proprietary technology has been diminished; SportsBubble's advancement in the sports streaming market was delayed and its advancement opportunities lost; and it lost customers, sales opportunities, partnerships, and market share to Defendants.  Though WatchSports functioned well upon release, SportsBubble was also unable to continue developing and improving the application due to the investment and business opportunities it lost following Defendants' announcement of their copycat in 2023.  In turn, Defendants gained valuable trade secrets without paying for it, thereby saving substantial development time and costs.

147.    It would be inequitable for Defendants to retain the benefits that SportsBubble conferred onto them.

**COUNT SIX**
**Fraudulent Misrepresentation,**
**State Common Law**

148.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

149.    ESPN knowingly made false representations to SportsBubble, including that they were genuinely interested in entering a strategic affiliate marketing partnership with SportsBubble concerning its Where to Watch product; that their use of SportsBubble's efforts, trade secrets, and confidential information provided during the negotiations were solely for the purposes of pursuing said partnership; and that the repeated stalls in the negotiations were due only to the technical and business-organization excuses that Defendants cited, all as described above.

150.    In particular, ESPN executives, including Mark Walker and Zach Malet, made statements to SportsBubble indicating, in substance, that ESPN was legitimately interested in partnering with SportsBubble.  These include, without limitation, (1) Mr. Malet's statement in a February 8, 2022 email noting "ESPN's excitement to be a part of SportsBubble," (2) oral statements that Defendants were interested in and moving towards a partnership from Mr. Malet and Mr. Walker during, at minimum, the following conversations:

a.    September 20, 2021, Zoom meeting with Mr. Walker, Mr. Lopes, and Mr. Magnus (ESPN), and Ms. Murphy-Stephans and Mr. Marquez (SportsBubble).

b.    October 20, 2021, Zoom meeting with Mr. Malet, Mr. Lopes, Mr. Connor, and Eli Augustine (ESPN, Director of Media Programming) (all ESPN), and Ms. Murphy-Stephans, Mr. Marquez, and Mr. Fehring (SportsBubble).

c.    December 14, 2021 Zoom meeting with Mr. Malet (ESPN) and Ms. Murphy-Stephans and Mr. Marquez (SportsBubble).

d.    February 2, 2022 Zoom meeting with Mr. Malet (ESPN) and Ms. Murphy-Stephans and Mr. Hopkins (SportsBubble).

48

e.  August 24, 2022 Zoom meeting with Mr. Malet and Ms. Baiocco (ESPN) and

Mr. Hopkins and Ms. Murphy-Stephans (SportsBubble).

f.  October and December 2022 calls between Mr. Walker (ESPN) and Ms. Murphy-

Stephans (SportsBubble).

g.  January 24, 2023 Zoom meeting with Mr. Malet (ESPN) and Ms. Murphy-

Stephans (SportsBubble).

h.  February 16, 2023 Zoom meeting with Mr. Walker (ESPN) and Ms. Murphy-

Stephans (SportsBubble).

151.    In truth, ESPN knew all along that it had no interest in partnering with

SportsBubble and that it planned secretly to launch their own competing product that they had

been developing for months or years.  After Defendants launched their copycat product, ESPN

stated it was never interested in partnering with SportsBubble.  Additionally, upon information

and belief, ESPN also knew that its shifting justifications for its delays in consummating the

relationship, such as its claims that those delays were due to SportsBubble's failure to license

ESPN's API from Gracenote, and/or that ESPN was developing its own API for SportsBubble's

use and had not yet done so, were false.

152.    Upon information and belief, ESPN made or facilitated these misrepresentations

with the intention to induce SportsBubble (1) into sharing its trade secrets and other confidential

technical and business information with Defendants, and (2) to devote resources and time to the

negotiations and/or cease pursuing or securing other business opportunities throughout the

negotiation period, so Defendants could gain a significant (and fraudulent) competitive

advantage and divert potential partners and users to themselves.

49

153.    SportsBubble reasonably relied on Defendants' fraudulent misrepresentations, and those misrepresentations were material, including because the misrepresentations induced SportsBubble to consider partnering with Defendants and to participate in the lengthy negotiations in the first place, to share the confidential business and technical information that it did, to divert precious resources to the talks with Defendants, and to cease pursuing or securing other business opportunities, including with other major media stakeholders throughout the fraudulent period.

154.    SportsBubble's reliance on ESPN's misrepresentations was reasonable and justifiable.  SportsBubble engaged directly with senior executives across multiple departments at Disney and ESPN, lending credibility to ESPN's representations and contractual commitments. Those executives remained in active contact with SportsBubble—agreeing to major partnership terms, providing regular updates on their internal progress towards consummating the partnership, demonstrating their enthusiasm about WatchSports, requesting additional technical details about the application, negotiating ancillary business terms, and maintaining friendly communications—throughout the relevant period.  SportsBubble also exercised diligence by inquiring further into ESPN's representations, including regarding their interest in partnering with SportsBubble and their delays in consummating the partnership.  But ESPN thwarted SportsBubble's investigative efforts by evading questions or providing additional misrepresentations.  Additionally, the information necessary to assess the truth of ESPN's representations was solely within its control.  Furthermore, SportsBubble, a startup with no history of competing with ESPN, had no reason to presume that ESPN would engage in fraud against it.

155.    As a direct and proximate result of ESPN's fraudulent misrepresentations, SportsBubble incurred substantial economic losses including labor costs, fees, and other expenses associated with preparing and sharing confidential materials and presentations with ESPN, engaging in API coordination efforts and addressing ESPN's false technical issues, and facilitating ESPN's access to SportsBubble's beta WatchSports app, among other things, throughout the 18-month negotiation period.  Additionally, SportsBubble lost the expected commercial value of its technology and anticipated profits, lost potential investors and business, and lost enterprise value.  ESPN's fraudulent misrepresentations enabled them to initiate and stall negotiations before announcing a copycat product, which undercut SportsBubble's standing in the market, its business reputation, and its sales opportunities.  Absent those misrepresentations, SportsBubble would have pursued and secured partnerships with other major media stakeholders and captured significantly greater market share.  These costs may be calculated at trial.

## COUNT SEVEN
## Fraudulent Concealment,
## State Common Law

156.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

157.    Upon information and belief, Defendants intentionally and fraudulently concealed from SportsBubble that they (1) had no interest in partnering with SportsBubble from the inception of the parties' negotiations, (2) had been developing a competing product, and (3) planned to use SportsBubble's trade secrets and other technical and business information, as well as its time sidelined during negotiations, to gain a competitive advantage.  Defendants, specifically through each of the individuals identified above who were involved in the

negotiations with SportsBubble, knowingly omitted this information during the parties' lengthy written and oral negotiations from August 2021 through March 2023.

158.    Defendants had a duty to disclose complete and accurate information about the above topics to SportsBubble because the Defendants alone had special knowledge that was not readily available to SportsBubble regarding the truth of these omissions, including because only Defendants knew that they were developing a competing product, that they were wrongfully disclosing and using SportsBubble's confidential information to develop their copycat product, and the true reasons behind their delays in consummating the relationship with SportsBubble. SportsBubble could not have discovered this information, and therefore the Defendants' failure to disclose complete and accurate information about these topics rendered the parties' transaction inherently unfair.

159.    Defendants knowingly and intentionally made partial or ambiguous statements that gave rise to an additional duty to disclose, including that they intended to partner with SportsBubble and that they only planned to use SportsBubble's proprietary technical and business information confidentially and for legitimate purposes.  Defendants also knowingly and intentionally made partial and ambiguous statements regarding the reasons for their delays in consummating the partnership, by stating that the delays were due to SportsBubble's need to license ESPN's API from Gracenote, then because ESPN was developing its own API for SportsBubble's use but had not done so.  By way of example, when Ms. Murphy-Stephans called Mr. Walker in December 2022 and January 2023 to inquire about the holdup and informed him that the repeated delays in the delivery of ESPN's API had prevented SportsBubble from securing other partnerships, Mr. Walker explained only that Disney and ESPN were going through a reorganization and things would get back on track in early 2023.  In a second example,

Mr. Malet informed SportsBubble throughout 2022 that ESPN was not able to consummate the partnership with SportsBubble only because it intended to develop an API for SportsBubble's use but had not yet done so.  These partial statements, and the others identified, knowingly misled SportsBubble and created a duty to fully and truthfully disclose all material facts related to those statements so as not to mislead SportsBubble.

160.    Upon information and belief, Defendants made or facilitated these omissions with the intent and knowledge that they would induce SportsBubble (1) into sharing its trade secrets and other confidential technical and business information, and (2) to cease pursuing other business opportunities throughout the negotiation period, so Defendants could gain a competitive advantage.  Defendants also knew that SportsBubble was acting on the basis of information concealed or partially propagated by Defendants.

161.    Each of these omissions were material because, had SportsBubble known the truth, it would not have disclosed its proprietary business and technical information throughout negotiations, nor invested as many resources into the negotiations or foregone other opportunities in reliance on Defendants' omissions.

162.    SportsBubble did reasonably rely on Defendants' material omissions, which deceived SportsBubble into believing that Defendants were only requesting and using SportsBubble's proprietary information for legitimate purposes, and that the delays in consummating the partnership were indeed due to the technical and business reasons that Defendants cited.  This deception caused SportsBubble to continue participating in lengthy negotiations in the manner that it did, disclosing trade secrets and other confidential business and technical information that it would have otherwise refused to disclose, and foregoing other business opportunities, including with major media stakeholders.

163.    SportsBubble's reliance on Defendants' omissions was reasonable and justifiable. SportsBubble engaged directly with senior executives across multiple departments at Disney and ESPN, who remained in active contact with SportsBubble—agreeing to major partnership terms, providing regular updates on their internal progress towards consummating the partnership, demonstrating their enthusiasm about WatchSports, requesting additional technical details about the application, negotiating ancillary business terms, and maintaining friendly communications—throughout the relevant period.  SportsBubble also exercised diligence by repeatedly checking in, reiterating that its data was confidential, and inquiring into Defendants' delays in consummating the partnership.  Furthermore, SportsBubble, a startup with no history of competing with ESPN, had no reason to presume that Defendants would engage in fraud against it.  And in many cases, Defendants provided partial assurances, which further induced SportsBubble's reliance.  The information necessary to uncover the truth underlying Defendants' omissions was not available to SportsBubble.

164.    As a direct and proximate result of Defendants' intentional and material omissions, SportsBubble incurred substantial economic losses including labor costs, fees, and other expenses associated with preparing and sharing confidential materials and presentations with Defendants, engaging in API coordination efforts and addressing Defendants' pretextual technical issues, and facilitating Defendants' access to SportsBubble's beta WatchSports app, among other things, throughout the 18-month negotiation period.  Additionally, SportsBubble lost the expected commercial value of its technology and anticipated profits.  Defendants' omissions enabled them to initiate and stall negotiations and announce a competing product first, which undercut SportsBubble's standing in the market and its business reputation.  Absent those omissions, SportsBubble would have pursued and secured partnerships with other major

media stakeholders and captured significantly greater market share.  These costs may be calculated at trial.

### COUNT EIGHT
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

165.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

166.    Defendants engaged in unlawful, unfair, and fraudulent business acts/practices, including, but not limited to, by willingly:  (a) acquiring SportsBubble's proprietary technical and business information through fraudulent means and misappropriating it to launch a copycat product; (b) fraudulently inducing SportsBubble into more than a year of protracted negotiations for a partnership that Defendants never intended to enter; (c) engaging in a broader course of conduct intended to mislead, delay, and disadvantage SportsBubble in the marketplace, including disseminating confidential information to personnel with no legitimate need to know, using that information for anticompetitive purposes, and offering pretextual explanations for repeated delays to prevent SportsBubble from pursuing alternative opportunities; and (d) passing off Where to Watch as their original product and idea, and misrepresenting the nature of their relationship with SportsBubble, in a manner likely to deceive consumers, investors, and other market participants.

167.    These acts significantly threatened and harmed competition in the sports media aggregation market.  Defendants misappropriated SportsBubble's innovative product—the first of its kind and a direct competitor to Defendants' own product—and leveraged Defendants' substantially greater market power and customer base to rapidly dominate the market.  The result was sidelining SportsBubble from the market, diminishing its first user advantage, and diverting

its customers, revenues, and marketshare to Defendants for their benefit. This conduct deprived consumers of meaningful choice, reduced incentives for innovation, and lessened (indeed, removed) competition, granting Defendants a monopoly in the market. Indeed, because Defendants' conduct deprived SportsBubble of the critical funding it needed to continue developing its product, its competitive abilities are greatly undermined.

168.    SportsBubble had invested substantial time, skill, and money into developing the proprietary technical and business information underlying its WatchSports application. Defendants appropriated and used that information to develop their copycat product at zero cost to them, and in violation of SportsBubble's implied and express consent.

169.    Defendants' actions were also fraudulent in that their public statements and presentations of Where to Watch—including marketing materials, product launch announcements, investor pitches, and app store descriptions—were likely to deceive members of the public and market participants, including potential investors and partners, regarding the nature of Defendants' relationship with SportsBubble, the originality of Defendants' product, and the source of Defendants' technical information. These misrepresentations were material because they influenced purchasing decisions, partnership opportunities, and market perception, thereby further entrenching Defendants' market dominance and diminishing competition.

170.    Defendants' conduct is also unlawful because it breaches all of the claims identified in this Complaint. Even if certain aspects of Defendants' conduct were not independently unlawful, they were unfair in that they were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to SportsBubble and competition in the market that outweighs any conceivable justification.

171.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent actions, the value of WatchSports, SportsBubble, and SportsBubble's current and future partnerships, were diminished.  Further, SportsBubble was prevented from securing a critical capital raise that was essential to the continued improvement of its product.  Defendants' conduct also cost SportsBubble the ability to pursue other partnerships, and delayed and inhibited SportsBubble's efforts to capture market share while Defendants developed their own copycat product.  Indeed, Defendants' conduct effectively eliminated SportsBubble's competitive advantage as the early mover.  And now that Defendants have released their product, they have largely eliminated their competitor SportsBubble, all through the unlawful, unfair, and fraudulent acts and practices enumerated in the preceding paragraphs.

### COUNT NINE
### Unfair Competition,
### State Common and Statutory Law

172.    SportsBubble realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

173.    The conduct alleged in Count Eight constitutes unlawful unfair competition under New York common law and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Ann. § 42-110a *et seq*.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays as follows:

a.  That SportsBubble be awarded compensatory damages in an amount to be determined at trial, but SportsBubble anticipates to be not less than $200 million;

b.  That SportsBubble be awarded all profits earned by ESPN and Disney from Where To Watch, and/or the value of all other benefits that ESPN and Disney wrongfully received from SportsBubble;

c.  That SportsBubble be awarded punitive damages of three times the amount of compensatory damages;

57

d.    That SportsBubble be awarded exemplary damages pursuant to all applicable statutes, of double the amount of compensatory damages;

e.    That SportsBubble be awarded all attorneys' fees and other costs associated with this action;

f.    That SportsBubble be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

g.    That the Court issue further equitable relief in the form of a permanent injunction prohibiting ESPN and Disney from operating Where to Watch or any other product or service that incorporates or uses SportsBubble's confidential information, or from competing in the sports event aggregation market;

h.    That SportsBubble receive such other, further, or different relief as the case may require and the Court deems just and proper under the circumstances.

## JURY TRIAL DEMANDED

SportsBubble hereby demands a trial by jury.

Date:  August 14, 2025              Respectfully submitted,

                                    /s/
                                    _____

                                    Neal Brickman
                                    James H. Neale
                                    The Brickman Law Group
                                    The GrayBar Building
                                    420 Lexington Avenue, Suite 2811
                                    New York, New York 10170
                                    Tel: 212-986-6840
                                    Neal@brickmanlaw.com
                                    Jneale@brickmanlaw.com

                                    *Counsel for Plaintiff SportsBubble, Inc.*